IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAMES R. KAMMEYER, JR.,　　　　　　)
and ALL INMATES HOUSED　　　　　　 )　　Civil Action No. 19-454-JPG
at USP MARION,　　　　　　　　　　 )
　　　Plaintiffs;　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
v.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　 )
Warden WILLIAM TRUE,　　　　　　　 )　　VERIFIED COMPLAINT FOR DAMAGES
　　　Individually and Officially )
Captain D. STICKLES,　　　　　　　 )　　　　Jury Trial is Demanded
　　　Individually and Officially )
S.I.S. Officer DANIEL HUGGINS,　　)
　　　Individually and Officially )
the UNITED STATES OF AMERICA,　　 )
　　　Defendants.　　　　　　　　　 )

## INTRODUCTION

1. This lawsuit presents a federal question of the "cruel and unusual punishments" clause of the United States Constitution, Amendment VIII. Prison officials at the United States Penitentiary in Marion have made, are making, and will make use of mass punishment as a means to manipulate inmates against one another, inflicting fear, mental anguish, misery, and the wanton infliction of pain and threat of violence; all of which the public at large would consider objectively intolerable. This lawsuit seeks injunctive and monetary damages. A claim of Property (Amendment IV) may appear as an amendment joined to this action after a separate FTCA claim is exhausted.

## JURISDICTION

2. This action is cognizable under 28 U.S.C. § 1331(a) and **Bivens v. Six Unknown Agents of Federal Bureau of Narcotics**, 403 U.S. 338 (1971). The Defendants, acting under the color of law and with their own subjective know-

ledge (written and verbally communicated to inmates), created a serious prison condition of physical harm, and the risk of it, under Farmer v. Brennan, 511 U.S. 825 (1994)(addressing risk of inmate-inmate assault).

3. This claim, if proven true, also gives rise to causation under the Fourth Amendment, as well as possible tort action(s). As such, at the Court's discretion, supplemental jurisdiction is invoked out of an abundance of caution under 28 U.S.C. § 1367 because certain state law claims arise out of the same law as the federal claims, which are not novel or complex issues of state law. Furthermore, the state claims do not substantially predominate the federal constitutional claims over which this Court has original jurisdiction.

## EXHAUSTION

4. As the facts will show, Plaintiff attempted to obtain an administrative remedy form from staff to begin the administrative remedy process pursuant to the PLRA. Plaintiff was told he could neither receive nor file one with regards to the Defendants' memos and/or actions. Plantiff would later follow up via email requesting the same. Under Pavey v. Conley, 663 F.3d 899, 2011 U.S. App. LEXIS 23318 (7th Cir. 2011), misinformation, misdirection, or otherwise making the administrative remedy process unavailable to an inmate means that the Administrative Remedy Process was unavailable under the PLRA. The Plaintiff has therefore "exhausted his remedies, as have other inmate witnesses as disclosed under Fed.R.Civ.P. Rule 26 (attached as exhibits and incorporated within the statement of facts as if fully reproduced).

## PARTIES TO THIS ACTION

5. Plaintiff is an inmate at the United States Penitentiary in Marion,

Illinois, register number #20118-081, address P.O. Box 1000, Marion, Illinois 62959.

6. Defendant William True is the Warden of the United States Penitentiary in Marion, Illinois, address 4500 Prison Road, Marion, Illinois 62959, and is sued in both his official and individual capacities.

7. Defendant D. Stickles (first name unknown) is a staff member at the United States Penitentiary in Marion with the rank of Captain, address 4500 Prison Road, Marion, Illinois 62959, and is sued in both his official and individual capacities.

8. Defendant Daniel Huggins is the Chief Technician for the Special Investigative Services (SIS) unit at the United States Penitentiary in Marion, address 4500 Prison Road, Marion, Illinois 62959, and is sued in both his official and individual capacities.

9. The United States of America is the only nameable defendant for the purposes of the Federal Tort Claims Act (FTCA), address unknown.

10. Plaintiff reserves the right to amend this Complaint to add additional defendants upon the receipt of additional discovery or upon addition of a claim pursuant to the FTCA upon exhaustion.


## STATEMENT OF FACTS

11. Plaintiff was an inmate at the United States Penitentiary in Marion, Illinois, during the time of all facts alleged herein.

12. There were 1,156 inmates housed at USP Marion as of April 19, 2019 (source: www.bop.gov), with a margin of error of ± 50.

13. Between roughly March 15, 2019, through March 30, 2019, an undisclosed number of inmates at USP Marion suffered overdoses from concoctions of synthetic

drugs (including "K2" and "Spice") and industrial chemicals. Many of these inmates required hospitalization, all were removed to the Special Housing Unit (SHU).

14. On March 30, 2019, the entire inmate population of USP Marion was placed on lockdown status. While not directly stated, it was generally understood that this was because of the ongoing drug problem. This lockdown lasted until April 8.

15. On April 1, Plaintiff received a memo written and signed by Defendant True, announcing that the entire inmate population would be sanctioned for the drug abuse of a few. Specifically, inmates would only be allowed a single five-minute phone call per day, and five outgoing emails per day. The monthly commissary spending limit would be reduced from $360 to $100. Defendant True stipulated that these restrictions would be enforced for 30 days, but any subsequent drug-related incidents would reset the 30-day clock. (Exhibit A).

16. This memo also stated that USP Marion staff would enforce a "zero tolerance" policy for drug use and distribution. Any inmate caught with drugs would be referred for prosecution. (Id.).

17. Code of Federal Regulations §§ 541.1-541.4, and BOP Policy 5270.09 ("Inmate Discipline Program") allow prison officials to impose "sanctions on inmates who commit prohibited acts," but forbid the imposition of sanctions in a "capricious and retaliatory manner." (C.F.R. § 541.1(F)).

18. On April 2, Plaintiff received a second memo, ordering him to pack three trash bags: one for his personal property (which he would get back), one for institution-issued clothing (which he would get back), and one for excess personal property (which he could mail home at his own expense). (Exhibit B).

19. After all inmates packed their bags accordingly, USP Marion staff conducted a shakedown of the entire facility on April 3-4. During this shake-

4

down, Plaintiff observed Defendant Stickles supervising staff in his housing unit. Unit Manager Dawn and Facilities Supervisor Haubaum also participated.

20. During the shakedown, staff simply discarded bags of excess property, along with personal property which didn't fit into a bag, into trash bins. No staff member offered any indication that excess property could or would be mailed home without prior (pre-lockdown) authorization.

21. BOP Policy 5580.08 requires staff to fill out a confiscation form (BP-402) for any property seized. If the ownership of personal property is unclear, staff must make reasonable efforts to ascertain its ownership before discarding it after 120 days.

22. To the best of Plaintiff's knowledge, all excess personal property not previously authorized for mailing was simply destroyed on the spot, and no confiscation forms were given to any inmates during the shakedown.

23. During the shakedown, staff also destroyed all the microwave ovens in inmate housing units. The microwaves had been purchased with inmate funds via the Trust Fund system.

24. During the nine-day lockdown, more inmates suffered drug overdoses, even after the shakedown.

25. On April 9, after the lockdown ended and even more inmates overdosed, Defendant True issued another memo lowering the monthly spending limit to $75. Instead of resetting the 30-day clock mentioned in ¶ 15, Defendant True simply tightened restrictions after just one day. (Exhibit C).

26. This new memo made clear that the new restriction was imposed against the entire inmate population solely as punishment for the continued drug abuse of "eight inmates" at USP Marion. (Id.).

27. The ever-tightening restrictions by Defendant True heightened tension and anxiety among an inmate population already fraught with tensions between

various groups.

28. Defendant True makes himself available to speak with inmates in the lunchroom on weekdays. During the week of April 8, Plaintiff saw Defendant True repeatedly become hostile towards any inmate trying to speak with him. Plaintiff heard True tell inmates that he wanted the drug problem solved "however [inmates] have to do it," that he "didn't care" how the drug problem was stopped, and that if they wanted the mass sanctions lifted, inmates should "enforce the rules" against other inmates who were suspected drug users or distributors. Any inmate who carried out such an "enforcement" would face "no consequences" for their actions. (see exhibited affidavits).

29. On or about April 11, Defendants True, Stickles, and Huggins met collectively and/or individually with the heads of various inmate groups and instructed them to "police [their] own." If inmates continued overdosing, they said, just drag them into a cell "so we don't see it." Defendant True reiterated his claim that anyone who took action, even violent action, against drug users would face no consequences, and that he "has the final authority as to who gets shipped [transferred]."

30. These inmate leaders pushed back, pointing out that it was not their job to "be the police" [enforce BOP rules]; rather, this was the job of BOP staff.

31. Inmates who had been removed to the SHU after overdosing (¶ 13) were returned to the general population within days, with no apparent consequence by staff for their actions (a de facto "catch and release" pattern by BOP staff).

32. To date, Plaintiff is aware of no criminal referrals or prosecutions stemming from these drug incidents, despite Defendant True's promise in ¶ 16.

33. To date, Plaintiff is aware of no steps staff have taken to restrict the import of drugs or access to industrial chemicals since the stated facts

began.

34. Defendant True, in April 2017, had issued a similar memo following a string of incidents (Exhibit D). Unlike the facts at bar, the 2017 memo instituted mass punishment against a single housing unit consisting of less than 200 inmates. Defendant True initiated a "snitch policy," encouraging inmates to inform on one another. This did not produce the desired effect, and may have only made things worse.

35. Defendant True's actions in response to the aforementioned facts are very similar to those taken in 2017, with the apparent expectation of a more favorable result this time.

36. Since April 8, the number of violent incidents on the campus of USP Marion dramatically increased on account of drug abuse, inmate "enforcement," and heightened tensions. In one instance, inmates carried out an "enforcement" against a transgender inmate summarily suspected of being a drug user, known as "Tizzie," and another against a sex offender known as "B" or "Barrett."

37. After one particularly violent incident on April 16, staff had to close an entire housing unit and temporarily relocate its occupants for hours just to clean up blood.

38. In the incident referred to in ¶ 37, an inmate named Shane "Che" Anthony was brutally beaten by an inmate named Adam Crom (22151-045), who believed his actions were justified under the "green light" given by the Defendants.

39. Crom was released back to the inmate population after only two days, following a pro forma investigation by SIS.

40. Defendant True has threatened to further restrict and lock down the entire inmate population for 30 days or longer if inmates do not continue to take action on their own initiative to stop the alleged drug abuse problem.

41. Inmates at USP Marion talked about organizing a food strike in protest of the restrictions. Plaintiff was threatened with retaliation by staff if he participated, and with violence by inmates if he did not. Plaintiff chose to not participate. "Staff" here includes Defendants.

42. Plaintiff made reasonable attempts to obtain an administrative remedy form from staff, but was told he could not receive one to file on Defendant True's actions. He later followed up with this request via email. (Exhibit E).

43. Because of the immediate threats of violence instigated by Defendants, coupled with active retaliation by staff, Plaintiff has suffered severe anxiety. He is in fear for his physical safety and fearful of unjustified disciplinary action (Exhibit F). He fears retaliatory transfer by Defendants in particular.

44. This state of mind is now commonplace at USP Marion. Any untimely recall or lockdown has sent inmates into a frenzy for fear they will not be out of their cells for a month or longer. In general, inmates are fearful of any words or actions being taken out of context and reported to staff for unjustified disciplinary action.

45. Plaintiff includes with this Complaint multiple affidavits by other inmates pursuant to Fed.R.Civ.P. Rule 26, incorporated herein.

## CLAIM FOR RELIEF

46. Defendants True, Stickles, and Huggins, in their individual and official capacities, have worked in concert to violate the scope of their duties and discretionary functions by consciously employing various forms of mass punishment upon the population of USP Marion, in an effort to coerce the inmates under their care to cooperate in their investigation of drug abuse, and to incite inmates to resort to violent means to combat and control the use of banned substances. These actions have only exacerbated the already-violent

conditions of prison life. Defendants have attempted to, and some cases been successful in, working in tandem with security threat groups to threaten the safety of the general inmate population. When tasked to make informed decisions and employ forward-thinking measures to ensure orderly and safe living conditions for inmates, Defendants have instead chosen to display deliberate indifference by both implicitly and explicitly encourage inmate-inmate violence, even turning a blind eye when such assaults occur. These actions collectively not only exhibit a blatant dereliction of duty, but also threaten the safety, security, and well-ordered conduct of USP Marion, in violation of the Eighth Amendment to the United States Constitution. These are serious objective conditions of confinement, which Defendants' very own state of mind caused, and thus give rise to a claim under the Eighth Amendment's "cruel and unusual punishments" clause.

47. Plaintiff reserves the right to amend this complaint to add claims for relief upon exhaustion of a pending FTCA claim.

This is a case about common sense lying face down in the dust of good intentions. Plaintiff expects the evidence will show that both staff and inmates desire a reduction or elimination of drug use on the campus of USP Marion. The evidence is also expected to show a systemic failure by Defendants to follow standardized practices for finding inmates guilty of incidents involving intoxicants, even intoxicants that cannot currently be detected in chemical tests: staff are failing to consistently make use of "motor skills assessment field sobriety checks." The sanctions imposed by Defendant True are in violation of both BOP Policy and the Code of Federal Regulations (¶ 17) because of their capricious and retaliatory imposition against the entire inmate population without due disciplinary process.

The effect and outcome implied by Defendants' actions was later confirmed

9

by their own verbal statements: inmates were expected to use violence against suspected drug users and distributors (i.e. fellow inmates) to end a problem which Defendants fostered and then refused to solve using their own training, expertise, official policies, and Technical Reference Manuals. Indeed, such unchecked violence flourished within the first weeks of the new policy (¶¶ 36-38), with "drugs" as a threadbare pretext and inmate enforcers protected by Defendants from accountability.

## LEGAL STANDARD & DISCUSSION

### I. Cruel and Unusual Punishment

It would seem that prison conditions that are "restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Conditions do not violate the Eighth Amendment unless they amount to "the unnecessary and wanton infliction of pain." Id. The Supreme Court has listed among basic human needs a requirement of "reasonable safety." Helling v. McKinney, 509 U.S. 25, 32 (1993).

Indeed, severe restrictions on prisoners who persist in misconduct are often found justified by the legitimate needs of security and discipline; viz. Trammell v. Keane, 338 F.3d 155, 163, 165-66 (2nd Cir. 2003)(upholding depri-vation of all property except one pair of shorts and denial of recreation, showers, hot water, and a cell bucket for about two weeks).

While the Government's objection will be that the staff of USP Marion acted appropriately to uphold the safety, security, and well-ordered conduct of the institution, the evidence will reveal something else. The Government will likely claim that it is impossible for Defendants to know the precise nature of the risk of inmate-inmate assaults. Alternately, even if they knew of

a risk, this risk was not believed to be "serious" or "excessive."

On the contrary, staff-incited inmate assaults occurred purposefully and perhaps wantonly, at a rate far exceeding the norm at USP Marion. Plaintiff answers that the "wanton infliction of pain" can mean several different things in prison litigation. Supreme Court decisions concerning inmates' Eighth Amendment claims have emphasized physical harm, or the risk of it; Farmer v. Brennan, 511 U.S. 825, 836 (1994)(addressing the risk of inmate-inmate assault). The Court has also held that unsafe conditions that "pose an unreasonable risk of serious damage to [an inmate's] future health" may violate the Eighth Amendment even if that damage has not yet occurred and may not affect every inmate exposed to the conditions; Helling v. McKinney at 33 ("A remedy for unsafe conditions need not await a tragic event."). Helling concerned exposure to tobacco smoke; other examples cited by the Court included exposure to the risk of inmate assault; Id. at 33-34.

Before turning to the Defendants' personal involvement, Plaintiff finds it helpful to outline some of the permissible actions under this claim.

"The scope of Eighth Amendment protection is broader than the mere infliction of physical pain"; evidence of "fear, mental anguish, and misery" can establish the requisite injury for an Eighth Amendment claim; see Scher v. Engelke, 943 F.2d 921, 924 (8th Cir. 1981); Kingsley v. Bureau of Prisons, 937 F.2d 26, 32 (2nd Cir. 1991).

Thus, suffering the "wanton infliction of pain" is injury, as a legal matter; see McLaurin v. Prater, 30 F.3d 982, 984 (8th Cir. 1994). As to any possible objection under Trammell, above (dealing with "severe restrictions on inmates who persist in misconduct"), that case dealt explicitly with the security and discipline of individual inmates who persisted in misconduct. It did not authorize mass punishment as a means to manipulate inmates to turn

11

against one another.

The Supreme Court has held that the inmate must show that the risk of which he complains is not one that today's society chooses to tolerate; Helling at 36. Even so, a prison official's subjective orders and behavior may violate the Eighth Amendment even if they do not violate state laws or the dictates of accreditation organizations; McCord v. Maggio, 910 F.2d 1248, 1250 (5th Cir. 1991)(no state laws violated, still finding an Eighth Amendment violation); Gates v. Cook, 376 F.3d 323 (5th Cir. 2004)(while compliance with ACA stand-ards may be a relevant consideration, it is not per se evidence of constitution-ality); Ruiz v. Estelle, 37 F. Supp. 2d 855, 901-25 (S.D. Tex. 1999)(ACA accreditation does not indicate whether the system is actually following its own procedures).

## II. Defendants' Own Personal Involvement

One cannot merely infer "recklessness" or "actual malice." Defendants Stickles and Huggins, acting under Defendant True's statements, were the actual cause of it. As to the objection that Defendants did not know the "pre-cise nature of the risk of inmate-inmate assault," a defendant need not know the precise nature of the risk to be found deliberately indifferent, as long as he or she knows that a serious risk exists. Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005)(holding an official who knew of a risk of assault could not escape liability by arguing that he did not know the assault would be a rape). A defendant also need not have knowledge of a specific risk to a specific individual from a specific source. For example, in an inmate-inmate assault case, "it does not matter whether the risk comes from a single source or mul-tiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his

12

situation face such a risk." Farmer at 843; see also Brown v. Budz, 398 F.3d
904, 914-15 (7th Cir. 2005)(holding deliberate indifference can be established
by knowledge either of a victim's vulnerability or of an assailant's predatory
nature; both are not required); Pierson v. Hartley, 391 F.3d 898, 903 (7th
Cir. 2004)(holding that an inmate could recover for assault by a violent
prisoner assigned to a "meritorious housing" [preferred housing] unit in vio-
lation of prison policy regardless of whether prison staff knew of the risk to
the particular inmate who was injured); Greene v. Bowles, 361 F.3d 290, 294-95
(6th Cir. 2004)(holding that a transgender prisoner could recover for assault
by a known "predatory inmate" either because of exposure to high-security in-
mates threatened her safety, or because placing that inmate in protective
custody created a risk for its occupants generally).

The facts at bar bear tremendous similarity to these cases. Indeed, one of
the first assaults was against a transgender inmate; another against a sex
offender (¶ 36). The assault against Shane Anthony (¶¶ 37-39) occurred because
the assailant believed his actions were sanctioned by officers of the United
States, as he and witnesses will likely testify to.

Prison officials must do what is reasonable, not what is easy; Farmer at
847; Hope v. Pelzer, 536 U.S. 730, 738. The Court in Farmer specifically held
that "it is enough that the official acted or failed to act despite his know-
ledge of a substantial risk of serious harm," and did not require proof that
the official acted because of the risk; Id. at 842 (emphasis added). The
Seventh Circuit has acknowledged that Farmer overruled some of its prior
decisions in holding that the official need not be shown to have intended the
harm that occurred; see Haley v. Gross, 86 F.3d 630, 641 (7th Cir. 1996).

Courts have indicated that there are various ways individual defendants'
causation and personal involvement can be shown. The Seventh Circuit in

13

Hildebrandt v. Illinois Dep't of Natural Resources held that "[a]n official satisfies the personal responsibility requirement...if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. In short, some causal connection or affirmative link between the action complained about and the official sued[.]" 347 F.3d 1014, 1039 (7th Cir. 2003)(citation omitted).

In sum, to find an Eighth Amendment violation occurred, Plaintiff must show the seriousness of the challenged conditions, to satisfy the objective component, and the state of mind of Defendants, to satisfy the subjective component. The facts speak for themselves: the sudden spike in inmate-inmate violence has engendered an environment that has sparked fear and mental anguish among inmates. This environment was intentionally created by the words and actions of the Defendants, in their encouragement of inmates to "enforce" the rules against one another by any means necessary. Plaintiff, and all inmates currently housed at USP Marion, are suffering cruel and unusual punishment because Defendants and their staff imposed mass punishment and gave verbal directions to inmates to violently turn against one another.

## RELIEF REQUESTED

For all the reasons set forth herein and in all accompanying evidence and documents, Plaintiff requests the following relief:

1.  Injunction prohibiting mass punishment sanctions (and mandating no such future use of mass punishment sanctions), and prohibiting Defendants from using inmates to commit offenses against other inmates (such as property crime, violence against the person) as outlined in the attached Motion

14

for Preliminary Injunction;

2.   Declaratory judgment that Defendants did destroy government and inmate-
     purchased property (including, but not limited to, microwaves, books,
     school and art supplies, etc.), unlawfully, and did incite inmates to
     turn on each other violently;

3.   $5,000,000 compensatory money damages,
     $5,000,000 punitive money damages,
     $1.00 nominal damages; and

4.   Certify class members as outlined in the attached motion.

                              Respectfully Submitted,

Dated: __4-25-2019__

                              James R. Kammeyer, Jr., pro se
                              Register No. 20118-081
                              United States Penitentiary, Marion
                              P.O. Box 1000
                              Marion, Illinois 62959-7500

     By signing the above, I hereby verify that the foregoing statements are
true, correct, and complete, to the best of my knowledge and recollection,
submitted under the penalty of perjury pursuant to 28 U.S.C. § 1746. Further,
I hereby affirm that this document was mailed on the above date using the
institution legal mail procedures, mailed via USPS prepaid first class postage.