## TABLE OF EXHIBITS

| Exhibit | Description | No. of Pages |
|---------|-------------|--------------|
| A | Memo signed by Warden William True, dated April 1, 2019. | 1 |
| B | Memo dated April 2, 2019, unsigned. | 1 |
| C | Memo signed by Warden William True, dated April 9, 2019. | 1 |
| D | Memo signed by Warden William True, dated April 17, 2017. | 1 |
| E | Verified Affidavit of Plaintiff James R. Kammeyer, Jr. (#20118-081) | 4 |
| F | Email from Plaintiff to Counselor Thompson | 1 |
| G | Verified Affidavit of Matthew G. Sullivan (#15792-026) | 4 |
| H | Verified Affidavit of Patrick Ziska (#57911-060) | 4 |
| I | Verified Affidavit of Carlton Miller (#42116-044) | 4 |
| J | Verified Affidavit of Eric Welch (#10444-089) | 7 |
| K | Verified Affidavit of John Alan Conroy (#42054-177) | 4 |
| L | Verified Affidavit of Tony Skannell (#25179-112) | 4 |
| M | Verified Affidavit of Jimmy Rhodes (#15025-064) | 4 |
| N | Verified Affidavit of Bradley Gammon (#07456-025) | 4 |
| O | Memo signed by Warden William True, dated April 24, 2019. | 1 |
| P | Verified Affidavit of Michael Smith (#18475-026) | 5 |

PLAINTIFF'S EXHIBIT A



**U.S. Department of Justice**
Federal Bureau of Prisons
*United States Penitentiary*
Marion, Illinois 62959

_____

April 1, 2019

MEMORANDUM FOR  INMATE POPULATION

FROM:          B. True, Warden

SUBJECT:          **Illicit Drug Use**

This memorandum is being formulated to advise the inmate population that possession, distribution or use of Spice, K2 and other illicit drugs will not be tolerated and you will be held responsible.

Spice, K2 and other illicit drug use pose a serious threat to the security and orderly running of this institution.  In addition, drugs such as Spice and K2 are considered to be very dangerous substances that can result in serious and possibly deadly consequences.  Use of Spice and K2 can lead to death, kidney failure, heart attacks and long term damage to mental health.

Until further notice, the following measures will be in place.

* Monthly Commissary Spending Limit will be reduced to $100.00

* Inmate Telephone Privileges will be reduced to 1, 5 minute telephone call per day

* Inmate e-mails will be reduced to 5 e-mails per day

The above restrictions will be reevaluated on a 30 days basis.  If during the 30 day period there are no incidents involving inmate drug use, the limits will be increased. Every incident involving inmate drug use will reset the 30 day time frame and may result in further reduced limits.

***We have a Zero tolerance policy for illicit drug use; therefore, inmates found in possession of Spice, K2 or any other illegal substance will be referred for prosecution.***

PLAINTIFF'S EXHIBIT B



**U.S. Department of Justice**
Federal Bureau of Prisons

*United States Penitentiary*
Marion, IL 62959

April 2, 2019

MEMORANDUM FOR:   Inmate Population

# You will receive three trash bags for the following:

**1st Trash bag is for all your commissary, personal clothing and items which fit into your locker that you can provide receipts for (you will get it back).**

**2nd Trash bag is for all your government issued clothing (You will get it back).**

**3rd Trash bag is for excess property that cannot fit in your locker (you won't get it back).**

**All excess property will be confiscated. If proof of receipt is provided, it will be shipped home by you or disposed of at your request. If receipt cannot be provided it will be properly disposed of.**

**It is highly recommended that your cell is in order to include sheets, blankets, and towels. Take pride in your living conditions and have it in order.**

<u>PLAINTIFF'S EXHIBIT C</u>



**U.S. Department of Justice**
Federal Bureau of Prisons
*United States Penitentiary*
Marion, Illinois 62959

---

April 9, 2019

MEMORANDUM FOR  INMATE POPULATION

FROM:              B. True, Warden

SUBJECT:          **Reduction in Commissary Spending Limits**

In accordance with the Illicit Drug Use memorandum issued to the inmate population on April 1, 2019, the monthly commissary spending limit is being reduced to $75.00. Specifically, since the beginning of the institutional Lockdown, a total of eight (8) inmates have been placed into the Special Housing Unit due to illicit drug use and or drug possession.

Until further notice, the following measures will be in place.

* Monthly Commissary Spending Limit will be reduced to $75.00

* Inmate Telephone Privileges will be reduced to 1, 5 minute telephone call per day

* Inmate e-mails will be reduced to 5 e-mails per day

The above restrictions will be reevaluated on a 30 days basis.  If during the 30 day period there are no incidents involving inmate drug use, the limits will be increased. Every incident involving inmate drug use will reset the 30 day time frame and may result in further reduced limits.

*We have a Zero tolerance policy for illicit drug use; therefore, inmates found in possession of Spice, K2 or any other illegal substance will be referred for prosecution.*

WELCH, ERIC  10444089

PLAINTIFF'S EXHIBIT D



**U.S. Department of Justice**

**Federal Bureau of Prisons**

*United States Penitentiary*

---

*4500 Prison Road*
*Marion, IL 62959*

April 19, 2017

FROM:　　　　　B. True, Warden

SUBJECT:　　　　Deterrence of alcohol, drug and weapons related incidents.

The occurrence of alcohol related incidents, to include; fighting and threatening staff, along with the significant amount of contraband, to include; alcohol, drugs and weapons has increased substantially at USP Marion. It has been determined this is directly impacting both the safety of staff and inmates. This type of behavior and contraband will not be tolerated as it negatively impacts the orderly running and operation of the facility. Effective with the issuance of this bulletin, the following privileges will be suspended for the discovery of such contraband, along with incidents in the units involving such contraband, example; fight involving intoxicated inmates.

**1st Offense within a 30 day period:**
-Loss of Television for 24 hours

**2nd Offense within a 30 day period:**
-Loss of Television and Phone access for 48 hours

**3rd Offence within a 30 day period:**
-Loss of Television/Phone/Computer access for 72 hours

All incidents in excess of 3 within a 90 day period may result in further administrative measures to gain compliance. When the unit is incident free for 30 days, this process will start over.

PLAINTIFF'S EXHIBIT E

VERIFIED AFFIDAVIT/DECLARATION OF  James R Kammeyer JR

State of Illinois        )
                         )  ss.        Register # 20118-081
County of Williamson     )

I, James Ramsay Kammeyer JR, currently incarcerated at U.S.P. Marion, P.O. Box 1000, 4500 Prison Road, Marion, Illinois  62959, do hereby swear and verify that if called upon to testify in this matter, I would testify as follows, to-wit:

1. On March 30, 2019, Warden William True locked-down U.S.P. Marion, alleging "Illicit Drug Use". [MEMORANDUM FOR INMATE POPULATION, April 1, 2019, issued on the third day of what would become a nine-day lockdown].

2. During that time, a shakedown of the entire institution ensued.

3. During that shakedown, the personal property of all inmates was discarded, my own and others I witnessed, to include correspondence course textbooks, inmate legal work and personal clothing within "institution limits", or lawfully purchased commissary, along with normal refuse.

4. I personally witnessed BOP Staff destroy government property by throwing away functionally safe microwaves out of every single unit. These microwaves had been purchased with inmate funds via the Trust Fund. All are now gone.

5. During this lockdown, the Warden and his agents gave all inmates nutritionally inadequate meals as a form of corporal punishment (no hot meals for six days, small portions).

6. N-Units toilets were deliberately turned off for six hours, where N-Unit is housed by 3-man cells, forcing inmates to live in conditions with human feces present.

7. The Warden's agents confiscated cleaning supplies from most units, to include toilet brushes, scouring pads, and Ajax/soap/disinfectant.

8. Prior to the Warden's actions, I personally observed a regular "catch and release" de facto (unwritten) policy enforced. Particular inmates obviously guilty of intoxication by K2, Spice, or commercial chemicals were locked up in the Special Housing Unit ("SHU"), only to be released a few days later with apparently no consequences in some cases.

9. I personally know of individuals who did in fact receive "shots" (Incident Reports and disciplinary action), where Medical Staff worked in tandem with Custody Staff to assure the accuracy, fairness and validity of a "motor-skills assessment field-sobriety test." For reasons unknown to me, the Warden's agents systematically failed to make those particularized assessments in their regular duty and care of custody.

10.  The Warden engaged in Mass Punishment against all inmates, regardless of the fact that most of us (myself included) do not use drugs or other intoxicants. This was a way of manipulating inmates to turn on each other.

11.  The April 1, 2019 Memo states, in relevant part, that all inmates in the institution receive the following sanctions without a particular finding of any prohibited act:  Monthly Commissary Spending Limit reduced to $100 (from $300);  Inmate Telephone Privileges reduced to one, 5-minute telephone call per day;  and e-mails reduced to five e-mails per day, for a period of 30 days.  "If during the 30 day period there are no incidents involving inmate drug use, the limits will be increased.  Every incident involving inmate drug use will reset the 30 day time frame and may result in further reduced limits."

12. ~~I personally overheard the Warden or his agents explicitly say that he does not care how the issue is resolved, that any inmate who personally takes action against users/distributors will face no consequences.~~

13.  I personally am aware of the institution calling so-called "shot-callers" from various groups on the compound to a meeting in the gym.  At this meeting, they or others who spoke with them unanimously held that the Warden's agents encouraged them to "fix the problem by any means necessary" and all the groups declined to do so because "that is the police's job."

14.  I am suffering a loss of access to the courts and I noticed that others are as well.

15.  During this time and up to the present day, I requested an administrative remedy from _Counselor Thompson_ , so that I could begin the administrative remedy process.  It was denied and I followed up with e-mail to no avail.

16.  I fear for my safety and honestly know and believe that the situation of
the security and orderly running of the institution is far more seriously
threatened now, than it was before when the Warden's agents engaged in
systematic "catch and release" of partiular individuals.  Now, mass
punishment has me (and those I talk with) on "pins and needles" with deadly
risk caused by the Warden's actions.

17.  I have already been threatened (implicitly or explicitly) with
retaliation by staff, to include the following:  the writing of bogus
"shots"; nuisance "shake-downs"; transfer out of my cell/housing unit
assignment; involuntary transfer out of work or programming assignment(s) and
participation; transfer out of the institution for "diesel therapy."

18.  For all of the reasons in this affidavit/declaration, I believe
petitioning the Court to be my only remaining (reasonable and lawful) option,
as the safety at USP Marion is immediately at risk and staff are indifferent
toward providing the administrative remedy process.

19.  In April of 2017, the Warden implemented a near-identical policy, but it
was targeted at particular housing units, and not the whole institution.  If
past performance is any indicator, mass punishment not only did not work, but
according to the Warden's own words, the situation has become worse.  He
seems to be throwing up his hands and saying "you inmates take care of it, I
have no willingness to order my Staff to engage in sobriety checks, and no
willingness to ship intoxicant users/distributors so that they and they alone
can experience the consequences of their own actions."

20.  I desire a remedy as follows:  Immediate injunction ordering the Warden
to immediately permit all inmates (except for those duly found guilty of
incident reports for particular prohibited acts), full and unrestricted normal
access to all Privileges;  Brand-new commercial-grade microwaves purchased
for every housing unit (three per unit), to kill food-borne bacteria and meal
preparation for those who (a) have a work schedule and physical demands for
meals outside of regular "chow hall" menu/times (to complement, not
supplement the institution meals); (b) have dietary demands due to exercise;

Affidavit of ~James Kammeyer~ , Page 3 of 4

and (c) have medical or religious meal needs for all of the above-named
purposes of meal preparation and safety.


May 15, 2019
Date Executed                                    /s/ _____

    Under penalty of perjury pursuant to 28 U.S.C. § 1746, I hereby swear
and verify that the foregoing is true and correct as an affidavit, and that
the facts stated on information and belief are true to the best of my
knowledge and belief. 33256-068

Witnessed by: ERIC STAFFORD /s/ E_____ 4-15-2019
                  07456-025                              Date

Witnessed by: Bradley Gammon /s/ Bradley Gammon 4-15-2019
                                                        Date


Affidavit of James Kammeyer, Page 4 of 4

PLAINTIFF'S EXHIBIT F

TRULINCS  20118081 - KAMMEYER, JAMES RAMSEY JR - Unit: MAR-G-A

--------------------------------------------------------------------------------------------------

FROM: 20118081
TO: Unit Management East
SUBJECT: ***Request to Staff*** KAMMEYER, JAMES, Reg# 20118081, MAR-G-A
DATE: 04/23/2019 06:50:14 AM

To: Mr. Thompson
Inmate Work Assignment: Unicor Cable 1

Mr Thompson,

I have tried to catch you several times since the lockdown earlier this month attempting to get a BP-8.  Can you please get one to me?

Respectfully,
James Kammeyer

PLAINTIFF'S EXHIBIT G

<u>VERIFIED AFFIDAVIT/DECLARATION OF MATTHEW G. SULLIVAN</u>

Illinois state)
         )   ss. 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      Register No. 15791-026
Williamson county)

     I, Matthew G. Sullivan, am currently incarcerated at the United States
Penitentiary in Marion, 4500 Prison Road, Marion, Illinois 62959. I do hereby
swear and verify that if called upon to testify in this matter, I would
testify as follows, to-wit:

     1. On March 30, 2019, Warden William True locked down USP Marion, alleg-
ing "Illicit Drug Use." [MEMORANDUM FOR INMATE POPULATION, April 1, 2019,
issued on the third day of what would become a nine-day lockdown].

     2. During that time, a shakedown of the entire institution ensued.

     3. Pursuant to the mass shakedown, massive amounts of personal property
belonging to the inmate population was forcibly discarded by USP Marion staff.
I, along with many other inmates, were forced to dispose of religious books
and pamphlets, legal documents, correspondence course textbooks, personal
clothing, and other items purchased from the inmate commissary. All items
listed were possessed well within the authorized institution limits.

     4. I personally witnessed BOP staff destroy government property by throw-
ing away functionally safe microwaves out of every single housing unit. These
microwaves had been purchased with inmate funds via the Trust Fund. All are
now gone.

     5. During this lockdown, the Warden and his agents gave all inmates
nutritionally inadequate meals as a form of corporal punishment (no hot meals
for six days, small portions).

     6. The toilets in housing units X and N were shut off for six hours or
more. As a result inmates who reside in those units were forced to live in
close proximity to human feces.

7. The Warden's agents confiscated cleaning supplies from most units, to include toilet brushes, scouring pads, and Ajax/soap/disinfectant.

8. Prior to the Warden's actions, I personally observed a regular "catch and release" de facto (unwritten) policy enforced. Particular inmates obviously guilty of intoxication by K2, Spice, or commercial chemicals were locked up in the Special Housing Unit ("SHU"), only to be released a few days later with apparently no consequences in some cases.

9. I personally know of individuals who did in fact receive "shots" (Incident Reports and disciplinary action), where Medical Staff worked in tandem with Custody Staff to assure the accuracy, fairness, and validity of a "motor skills assessment field sobriety test." For reasons unknown to me, the Warden's agents systematically failed to make these particularized assessments in their regular duty and care of custody.

10. The Warden engaged in Mass Punishment against all inmates, regardless of the fact that most of us (myself included) do not use drugs or other intoxicants. This was a way of manipulating inmates to turn on each other.

11. The April 1, 2019 memo states, in relevant part, that all inmates in the instutition would receive the following sanctions without a particular finding of any prohibited act: Monthly Commissary Spending Limit reduced to $100 (from $360); Inmate Telephone Privileges reduced to one five-minute telephone call per day; and emails reduced to five emails per day, for a period of 30 days. "If during the 30-day period there are no incidents involving inmate drug use, the limits will be increased. Every incident involving inmate drug use will reset the 30-day time frame and may result in further reduced limits."

12. I personally overheard the Warden or his agents explicitly say that he does not care how the issue is resolved, that any inmate who personally takes action against users/distributors will face no consequences.

13. I personally am aware of the institution calling so-called "shot-

callers" from various groups on the compound to a meeting in the gym. At this meeting, they or others who spoke with them unanimously held that the Warden's agents encouraged them to "fix the problem by any means necessary" and all the groups declined to do so because "that is the police's job."

14. Due to the restriction on both daily telephone minutes and email correspondence, I have been unable to adequately communicate with the Seventh Circuit Court of Appeals and the McLean County Judicial Court regarding my pending cases. Thus, my due process right to access to the courts has been unduly hampered.

15. I have asked numerous staff members for an administrative remedy form so that I could appeal the sanctions that have been unjustly bestowed upon me. All such requests have been verbally denied.

16. The actions of Warden True and his staff members have caused me to fear for my safety. Warden True's actions have given security threat groups and violent offenders the liberty to carry out gang-style hits on various members of the inmate population without provocation or justification. Violence and the threat of violence has increased because of the green light placed on suspected drug dealers and users. As long as the newly implemented rules and procedures stay in place, I fear that the violence will continue if not grow worse.

17. I have already been threatened (implicitly or explicitly) with retaliation by staff, to include the following: the writing of bogus "shots"; nuisance shakedowns, transfer out of my cell/housing unit assignment, involuntary transfer out of work or programming assignment(s) and participation; transfer out of the institution for "diesel therapy"; etc.

18. For all the reasons in this affidavit/declaration, I believe petitioning the Court to be my only remaining (reasonable and lawful) option, as the safety of USP Marion is immediately at risk and staff are indifferent toward providing the administrative remedy process.

19. In April 2017, the Warden implemented a near-identical policy, but it was targeted at particular housing units, and not the whole institution. If past performance is any indicator, mass punishment not only did not work, but according to the Warden's own words, the situation has become worse. He seems to be throwing up his hands and saying "you inmates take care of it; I have no willingness to order my Staff to engage in sobriety checks, and no willingness to transfer intoxicant users/distributors so that they and they alone can experience the consequences of their own actions."

20. I desire a remedy as follows: Immediate injunction order the Warden to immediately permit all inmates (except for those duly found guilty of incident reports for particular prohibited acts) full and unrestricted normal acesss to all privileges; brand-new commercial-grade microwaves purchased for every housing unit (three per unit), to kill food-borne bacteria and facilitate meal preparation for those who (a) have a work schedule and physical demands for meals outside of regular meals; (b) have dietary demands due to exercise; and/or (c) have medical or religious meal needs for all of the above-named purposes of meal preparation and safety.

Dated: 4/18/2019

Matthew G. Sullivan, Reg. No. 15791-026

Under the penalty of perjury pursuant to 28 U.S.C. § 1746, I hereby swear that the foregoing is true and correct to the best of my knowledge and belief.

Witnessed by: S. Williams   /s/ S. Williams   4/18/19
              S. Williams                      Date

Witnessed by: Nakia Mack Phillips   /s/        4/18/19
                                               Date

PLAINTIFF'S EXHIBIT H

## VERIFIED AFFIDAVIT OF PATRICK ZISKA

I, Patrick Ziska, do declare the following under the penalty of perjury:

1. I am an inmate at the United States Penitentiary in Marion, Illinois, register number #57911-060, and have been housed in Marion since December 2015.

2. On March 30, 2019, the inmate population of USP Marion was locked down on account of drug abuse. The lockdown would last until April 8.

3. On April 1, 2019, Warden William True issued a memo informing me and all other inmates that we were all being sanctioned for the ongoing drug abuse. We could only make one five-minute phone call per day, send five emails per day, and spend $100 per month. The memo said this would last for 30 days or until the drug problem went away.

4. I was concerned about the issue of mass sanctions and wanted to file an administrative remedy form about it. When I could, I asked my unit case manager, Mr. Murphy, for a form, but he said that I couldn't file one on the memo. I never got an administrative remedy form from anyone.

5. While we were locked down, USP Marion staff conducted a shakedown of everyone's cell, after making us all pack our property into trash bags. I had a large number of textbooks (with receipts) that I was planning to send home but hadn't gotten the stamps for before the lockdown. I put these books in a bag and put the mail-out authorization form (which I already had) on top of the bag.

6. During the shakedown, I saw staff throwing away bags of excess property, contrary to what they had told us in the earlier memo. Staff didn't care if we had receipts; they just threw stuff away as they felt like it.

7. When staff reached my cell, I tried to explain that my bag of books needed to be mailed out, but they were unwilling to listen. It took almost 30

minutes of pointing out the rules before they agreed to let me put some of my
books outside the counselor's office to be mailed. The other books were thrown
away. I am aware of other inmates who had very similar experiences.

8. While I do not remember every staff member involved in the shakedown,
I do recall all members of my unit team and unit managment, with several
psychology staff, working in the unit, with Captain Stickles supervising
between units.

9. After the lockdown ended, Warden True lowered the monthly spending
limit to $75 after one day, citing the fact that eight more inmates were caught
using drugs.

10. The restrictions frustrated many inmates, who tried to reasonably
point out to Warden True that they weren't doing drugs and shouldn't be pun-
ished. I heard him tell multiple inmates that he didn't care. He instead asked
them what they were doing about the drug problem, and suggested they "do
something" about the people who were doing drugs. My impression was that he
expected the inmates to solve the drug problem on their own by any means nec-
essary.

11. I am aware that the Warden and other high-level staff called inmate
representatives into meetings and told them to "police [their] own." I am
aware that they told those inmates would be lifted if the inmates took action
on their own to stop drug abuse by "enforcing the rules." When asked about
getting in trouble for "enforcing" the rules, Warden True told inmates that
no one who enforced the rules would get in trouble because "[he makes] the
final decision on who gets shipped."

12. My understanding of the BOP, having been in it for several years, is
that inmates are expected to follow the rules, and staff are expected to
enforce them. Not the other way around.

13. Based on these statements made by the Warden and his staff, I and

other inmates clearly interpreted his intent to mean that if we assaulted drug users, he would protect us.

14. USP Marion is a generally nonviolent campus, which sees on average about one fight per month. Within the first two weeks of these comments by the warden, fights took place far more often, such that I lost count of how many took place.

15. One fight was so bad that a whole housing unit was closed for hours while staff cleaned up the blood. The two inmates who started the fight were released back to the inmate population after two days. They said they were just doing what they had been told to do.

16. The inmates who had been caught doing drugs have been released back to the inmate population, and several have since been assaulted.

17. I was threatened with violence if I didn't participate in a proposed food strike, which thankfully never took place. Given the recent outbreaks of violence I have found it necessary to avoid many of the common areas of USP Marion and keep a low profile.

18. I have been diagnosed with autism and anxiety disorders. USP Marion is already a challenging environment for me and the new tone the warden is set-ting has increased my anxiety a lot.

19. I tried to follow up via email regarding an administrative remedy. I never received a response. I believe petitioning the Court to be the only remaining option available.

20. Because of the restrictions on communication imposed by Warden True, it has been difficult to communicate with my family. This is doubly difficult because I have a "red flag" placed on all my communications already. Normally my emails are held for 24 hours, but now are being held for up to a week before sending. I believe my phone conversations are being singled out for monitoring. No one has given me a reason for why these particular restrictions

3

were imposed on me.

21. I believe the Warden's actions are unconstitutional and request the Court overturn the mass sanctions immediately and end the policy of turning a blind eye towards violence. I would also like to be compensated for the property staff threw away.


I, Patrick Ziska, do declare the foregoing statements are true, correct, and complete, to the best of my knowledge and recollection, submitted under the penalty of perjury pursuant to 18 U.S.C. § 1746.


Dated: April 20ᵗʰ, 2019          /s/ _____

Patrick Ziska (#57911-060)
United States Penitentiary, Marion
P.O. Box 1000
Marion, Illinois 62959-7500


Witnessed by:

John Rust  91562-083          _____    20 April 2019
Name                          Signature           Date


Matthew Sullivan              _____    4/20/2019
Name                          Signature           Date

PLAINTIFF'S EXHIBIT I

## VERIFIED AFFIDAVIT OF CARLTON MILLER

I, Carlton Miller, currently incarcerated at USP Marion, P.O. Box 1000, Marion, Illinois 62959, do hereby swear and verify that if called upon to testify in this matter, I would testify as follows, to wit:

1. On March 30, 2019, Warden William True locked down USP Marion, alleging "Illicit Drug Use." [MEMORANDUM FOR INMATE POPULATION, April 1, 2019, issued on the third day of what would become a nine-day lockdown].

2. During that time, a shakedown of the entire institution ensued.

3. During that shakedown, my own personal property was thrown away (with normal garbage) as well as that of others I witnessed, which included: personally purchased and owned books, commissary (food and clothing), and legal work and files.

4. In addition to personal property, several items of clothing/laundry issued by the institution were taken for no reason. I have made attempts to obtain new issues and have been denied by staff. I am aware of other inmates who have similarly been unable to obtain new clothing issues.

5. During this lockdown, the Warden and his agents gave all inmates nutritionally inadequate meals as a form of corporal punishment (no hot meals for six days, small portions).

6. N Unit toilets were deliberately turned off for six hours, where inmates housed in three-man cells were forced to live in conditions with raw sewage and human feces present throughout the entire six-hour period.

7. The Warden's agents confiscated cleaning supplies from most units, to include toilet brushes, scouring pads, and Ajax/soap/disinfectant.

8. Prior to the Warden's actions, I personally observed a regular "catch and release" de facto policy enforced. Particular inmates obviously guilty of intoxication by K2, Spice, or commercial chemicals were locked up in the

Special Housing Unit (SHU), only to be released a few days later with apparently no consequences in some cases.

9. Prior to the lockdown, I personally witnessed one inmate be detained by staff in front of the chow hall, where they found a small canister full of small paper rectangles (known by inmates to be an intoxicant such as K2, Spice, or other commercial chemical). This canister was returned to the inmate and he was let go on his way.

10. I personally know of individuals who did in fact receive "shots" (Incident Reports and disciplinary action), where Medical Staff worked in tandem with Custody Staff to assure the accuracy, fairness, and validity of a "motor skills assessment field sobriety test." For reasons unknown to me, othe Warden's agents systematically failed to make these particularized assessments in their regular duty and care of custody.

11. The Warden engaged in mass punishment against all inmates, regardless of the fact that most of us (myself included) do not use drugs or other intoxicants. This was a way of manipulating inmates to turn on each other.

12. The April 1, 2019, Memo states, in relevant part, that all inmates in the institution receive the following sanctions without a particular finding of any prohibited act: Monthly Commissary Spending Limit reduced to $100 (from $360); Inmate Telephone Privileges reduced to one five-minute phone call per day; and emails reduced to five emails per day, for a period of 30 days. "If during the 30-day period there are no incidents involving inmate drug use, the limits will be increased. Every incident involving inmate drug use will reset the 30-day time frame and may result in further reduced limits.

13. I personally am aware of the institution calling so-called "shot callers" from various groups on the compound to a meeting in the gym. At this meeting, they or others who spoke with them unanimously held that the Warden's agents encouraged them to "fix the problem by any means necessary" and all the

groups declined to do so because "that is the police's job."

14. Following our release from lockdown, I requested an administrative remedy from Case Manager E. Murphy, so that I could begin the administrative remedy process.

15. I fear for my safety and know and believe that the situation of the security and orderly running of the institution is far more seriously threatened now, than it was before when the Warden's agents engaged in systematic "catch and release" of particular individuals. Now, mass punishment has me (and those I talk with) on "pins and needles" with deadly risk caused by the Warden's actions.

16. I have already been threatened (implicitly or explicitly) with retaliation or harassment by staff, to include the following: the writing of bogus "shots", nuisance "shakedowns", the closure of Unicor and this facility if another lockdown occurs, transfer out of the institution for "diesel therapy" or relocation to a compound where I cannot safely live on account of my conviction, etc.

17. For all of the reasons in this affidavit, I believe petitioning the Court to be my only remaining (reasonable and lawful) option, as the safety of USP Marion is immediately at risk and staff are indifferent towards providing the administrative remedy process.

18. In April 2017, the Warden implemented a near-identical policy, but it was targeted at particular housing units, and not the whole institution. If past performance is any indicator, mass punishment not only did not work, but according to the Warden's own words, the situation has become worse. He seems to be throwing up his hands and saying "you inmates take care of it, I have no willingness to order my Staff to engage in sobriety checks, and no willingness to ship intoxicant users/distributors so that they and they alone can

experience the consequences of their actions.

19. I desire a remedy as follows: Immediate injunction ordering the Warden to immediately permit all inmates (expect for those duly found guilty of incident reports for particular prohibited acts) full and unrestricted normal access to all privileges; brand-new commercial-grade microwaves purchased for every housing unit (three per unit), to kill food-borne bacteria and meal preparation for those who (a) have a work schedule and physical demands for meals outside of regular food service menu and schedules; (b) have dietary demands due to exercise; and (c) have special medical or religious needs.

I, Carlton Miller, do declare the foregoing statements are true, correct, and complete, to the best of my knowledge and recollection, submitted under the penalty of perjury pursuant to 18 U.S.C. § 1746.

Dated: _April 23, 2019_

Carlton Miller
Register No. 42116-044
c/o United States Penitentiary, Marion
P.O. Box 1000
Marion, Illinois 62959-7500

Witnessed by: John Rust
Name                    Signature                    23 April 2019
                                                     Date

Bryan Tomey          Bryan Tomey          23 April, 2019
Name                    Signature                    Date

4

PLAINTIFF'S EXHIBIT J

VERIFIED AFFIDAVIT/DECLARATION OF ___ERIC D. WELCH___

State of Illinois )
) ss.          Register # _10444-089_
County of Williamson )

I, ___ERIC D. WELCH___, currently incarcerated at U.S.P. Marion, P.O.
Box 1000, 4500 Prison Road, Marion, Illinois 62959, do hereby swear and
verify that if called upon to testify in this matter, I would testify as
follows, to-wit:

1.   On March 30, 2019, Warden William True locked-down U.S.P. Marion,
alleging "Illicit Drug Use". [MEMORANDUM FOR INMATE POPULATION, April 1,
2019, issued on the third day of what would become a nine-day lockdown].
2.   During that time, a shakedown of the entire institution ensued.
3.   During that shakedown, the personal property of all inmates was
discarded, my own and others I witnessed, to include correspondence course
textbooks, inmate legal work and personal clothing within "institution
limits", or lawfully purchased commissary, along with normal refuse.
4.   I personally witnessed BOP Staff** destroy government property by throwing
away functionally safe microwaves out of every single unit. These microwaves
had been purchased with inmate funds via the Trust Fund. All are now gone.
5.   During this lockdown, the Warden and his agents gave all inmates
nutritionally inadequate meals as a form of corporal punishment (no hot meals
for six days, small portions).


6.   ~~N-Units toilets were deliberately turned off for six hours, where N-Unit is housed by 3-man cells, forcing inmates to live in conditions with human feces present.~~


7.   ~~The Warden's agents confiscated cleaning supplies from most units, to include toilet brushes, scouring pads, and Ajax/soap/disinfectant.~~

8.   Prior to the Warden's actions, I personally observed a regular "catch
and release" de facto (unwritten) policy enforced. Particular inmates
obviously guilty of intoxication by K2, Spice, or commercial chemicals
were locked up in the Special Housing Unit ("SHU"), only to be released a few
days later with apparently no consequences in some cases.
                              *Robert Freeman, for example
9.   I personally know of individuals who did in fact receive "shots"
(Incident Reports and disciplinary action), where Medical Staff worked in
tandem with Custody Staff to assure the accuracy, fairness and validity of a
"motor-skills assessment field-sobriety test." For reasons unknown to me,
the Warden's agents systematically failed to make these particularized
assessments in their regular duty and care of custody.

** "Staff": Unit Manager Coordinator Dawn and Facilities Manager Hanbaum gave this direction.

10.  The Warden engaged in Mass Punishment against all inmates, regardless of the fact that most of us (myself included) do not use drugs or other intoxicants. This was a way of manipulating inmates to turn on each other.

11.  The April 1, 2019 Memo states, in relevant part, that all inmates in the institution receive the following sanctions without a particular finding of any prohibited act:  Monthly Commissary Spending Limit reduced to $100 (from $300);  Inmate Telephone Privileges reduced to one, 5-minute telephone call per day;  and e-mails reduced to five e-mails per day, for a period of 30 days.  "If during the 30 day period there are no incidents involving inmate drug use, the limits will be increased.  Every incident involving inmate drug use will reset the 30 day time frame and may result in further reduced limits."

12.  I personally overheard the Warden or his agents explicitly say that he does not care how the issue is resolved, that any inmate who personally takes action against users/distributors will face no consequences.

13.  I personally am aware of the institution calling so-called "shot-callers" from various groups on the compound to a meeting in the gym.  At this meeting, they or others who spoke with them unanimously held that the Warden's agents encouraged them to "fix the problem by any means necessary" and all the groups declined to do so because "that is the police's job."

14.  I am suffering a loss of access to the courts and I noticed that others are as well.

15.  During this time, I requested a "sensitive 9" administrative remedy from Case Manager Coordinator Dawn, Unit Manager Ms. Byrum, and Unit Manager Aaron Deaton.  Ms. Dawn said "I don't know why, you already wrote the Warden." I responded "I need protection from weaponized self-pity."  Mr. Deaton informed me, my counselor  Mr. J. David, would be in the next day.  Based on a prior interaction with Mr. David about six weeks prior, wherein I had composed the language in a BP-8 asking for 20 minutes to eat lunch instead of 4 minutes, Mr. David told me if "you ever do that again, I'll ship you to the big units" (a removal of a privilege).  Not wishing to invoke retaliation for exercizing a right, I have obeyed Mr. David's directive to this day and refrained from writing.

Affidavit of ____ERIC D. WELCH____, Page 2 of 4

16.  I fear for my safety and honestly know and believe that the situation of
the security and orderly running of the institution is far more seriously
threatened now, than it was before when the Warden's agents engaged in
systematic "catch and release" of particular individuals. Now, mass
punishment has me (and those I talk with) on "pins and needles" with deadly
risk caused by the Warden's actions.

17.  I have already been threatened (implicitly or explicitly) with
retaliation by staff, to include the following:  the writing of bogus (planted contraband)
"shots"; nuisance "shake-downs"; transfer out of my cell/housing unit
assignment; involuntary transfer out of work or programming assignment(s) and
participation; transfer out of the institution for "diesel therapy."

18.  For all of the reasons in this affidavit/declaration, I believe
petitioning the Court to be my only remaining (reasonable and lawful) option,
as the safety at USP Marion is immediately at risk and staff are indifferent
toward providing the administrative remedy process.

19.  In April of 2017, the Warden implemented a near-identical policy, but it
was targeted at particular housing units, and not the whole institution.  If
past performance is any indicator, mass punishment not only did not work, but
according to the Warden's own words, the situation has become worse.  He
seems to be throwing up his hands and saying "you inmates take care of it, I
have no willingness to order my Staff to engage in sobriety checks, and no
willingness to ship intoxicant users/distributors so that they and they alone
can experience the consequences of their own actions."

20.  I desire a remedy as follows:  Immediate injunction ordering the Warden
to immediately permit all inmates (except for those duly found guilty of
incident reports for particular prohibited acts), full and unrestricted normal
access to all Privileges;  Brand-new commercial-grade microwaves purchased
for every housing unit (three per unit), to kill food-borne bacteria and meal
preparation for those who (a) have a work schedule and physical demands for
meals outside of regular "chow hall" menu/times (to complement, not
supplement the institution meals); (b) have dietary demands due to exercise;

and (c) have medical or religious meal needs for all of the above-named purposes of meal preparation and safety.

21.  I authored the attached email to the Warden and did not receive a response. I also received an email back from the Trust Fund Coordinator Ms. Winn concerning a clarification to the mass punishment sanctions.  She responded that we were under a form of punishment:  "It works the same way with DHO or UDC sanctions."

22.  On April 23, 2019 (in a similar manner to the Complaint ¶38), inmate Philip Carrier was beaten to within an inch of his life in "N-Unit" sometime after dinner.  All inmates were recalled to their housing units.  Since I work in UNICOR along with inmate Carrier I noticed he was not at work on April 24.  About ten people told me what happened and everyone had a unanimous telling of the facts.

23.  I am aware of the theft-to-support-a-drug-habit beating of inmate Anthony by inmate Crom.  I overheard S.I.S. relating the event to another staff member. I also spoke with Crom and inmates Foster and Blue, who related to me in general that they were doing "exactly what S.I.S. told us to do," and that the choice had really been made for them "by the police."  I tended to believe this because at least ten other inmates described the events the same way as it appears in the Complaint.

_April 24, 2019_                          /s/ _Eric W_____
Date Executed

     Under penalty of perjury pursuant to 28 U.S.C. § 1746, I hereby swear and verify that the foregoing is true and correct as an affidavit, and that the facts stated on information and belief are true to the best of my knowledge and belief.

Witnessed by: _Kevin Ickes 15159-097_ /s/ _Kevin Ickes_____ _4-24-19_
                                                              Date
Witnessed by: _Jonathan Kearn_ /s/ _Jonathan Kearn_____ _4-24-19_
                                                              Date


Affidavit of _Eric D. Welch_ Page 4 of 4

TRULINCS  10444089 - WELCH, ERIC DEXTER - Unit: MAR-B-A

---------------------------------------------------------------------------------------------

FROM: 10444089
TO: Warden
SUBJECT: ***Request to Staff*** WELCH, ERIC, Reg# 10444089, MAR-B-A
DATE: 04/07/2019 01:30:29 PM

To: Warden William True and Captain D. Stickles
Inmate Work Assignment: UNICOR

Dear Warden True:

First of all, it is essential that you know I am sincere in saying I appreciate what you are trying to accomplish (reduce or eliminate drug use on the compound). I took the opportunity for spring cleaning in stride. That being said the recent actions you took in trying to accomplish that worth goal has even more of us and our families concerned for our "safety and security."

In effect, instead of having your highly trained staff administer more frequent and roaming "motor-skills assessment field sobriety checks," you went with a more medieval approach: Make inmates police each other. While not explicit, it is de facto in your Memorandum. To-wit: This has created a structure which -- in your words -- "pose[s] a serious threat to the security and orderly running of this institution." [MEMORANDUM FOR INMATE POPULATION, April 1, 2019]. This exists by participation in the essential ramifications of the Memo.

You and I have only talked brief in the past at mainline, and I always maintain that you are, and not I, the expert when it comes to running a prison. The psychological effect and spring cleaning were well-intentioned. As for the Mass Punishment, you previously implemented a similar policy in a memo dated April 19, 2017 for "deterrence of alcohol, drug and weapons related incidents." The difference is the 2017 memo affected the population of a single unit, whereas the present 2019 memo is administered to the entire inmate population (appx. ⚡1134 inmates, +/-11, www.bop.app.).
                                                                              gov
Put simply, there are really only four things to consider, and some are interrelated.

1.  Both the Staff AND a majority of the inmates desire to reduce or eliminate drug use on the compound.

2.  Mass punishment offends the conscience:  United States Government employees are given large amounts of taxpayer dollars for training and custodial duties.  Prisoner safety suffers more severe risk and Inmate A desires to keep the place running sane, but Prisoner B desires to get high and cause health problems to himself an others if he ends up violent.  Inmate A's desire to avoid sanctions "de facto" motivates him to "snitch" or otherwise engage in the care and well being of his fellow inmate (something that, while noble, is not something he is trained nor paid to do).  The judge who sentenced us did not sentence us to the care and custody of each inmate with whom one is incarcerated.  As a result, Inmate B (or his gang of friends) retaliate against Inmate A ... all due to the new "snitch policy."

3.  The Code of Federal Regulations Sections 541.1 and 541.4 are cited by and shaped the Policy 5270.09 Inmate Discipline Program.  This only allows staff "to impose sanctions on inmates who commit prohibited acts.  Sanctions will not be imposed in a capricious or retaliatory manner."  One sanction is "Loss of Privileges" (e.g. visiting, telephone, e-mail, commissary, etc.) CFR Section 541.f(F).  There is no exception in Policy that permits sanctions as tools to manipulate inmates to turn on each other.

4.  According to empirical data submitted and adopted into the First Step Act, family contact is essential to prevent recidivism and encourage inmates to make housing and employment contacts when they are getting ready to go home.  The April 2019 (and the April 2017) memos undermined these policy and empirical custody considerations.
     Additionally, access to the Courts is offended (a First Amendment right).  Many inmates have one, two, or three cases they are fighting and make use of outside acquaintances to relay information back and forth to the courts, or they call or email the courts or their attorneys directly.  The phone is perhaps even more critical for this endeavor and right.  Absent rational basis (like earning an incident report by a particular inmate who receives a particular sanction), reducing phone and email is a "loss," just as it would be a "loss to receive less money in your paycheck for doing the same work.

Please take this in the way it was intended, and reconsider your approach to reducing or eliminating drug use on the compound.  Make use of medical staff and roaming custody staff in tandem to perform motor skills assessment field sobriety checks.  If past performance is any indicator, consider that your 2017 "snitch policy" had apparently no effect (indeed the situation is even worse now), and now find ourselves in a lockdown for over a week in 2019.  Instead of having your staff do the job they are assigned to you to do, you have extended a bad "policy" and applies it now to the whole compound.  This despite the fact that it did not do what most of us want: Less or no intoxicants.

TRULINCS  10444089 - WELCH, ERIC DEXTER - Unit: MAR-B-A
--------------------------------------------------------------------------------

One last consideration is a request that you talk with Adam Hanna or Mr. Pfeffer at the Fairview Heights U.S. Attorneys' Office. They may have better advice on solving the cost/benefit of your ending up paying or reorganizing staff appropriately (K2 and Spice Incident Reports are upheld against the inmates based on medical assessments), versus incurring outside and inside litigation which no one really enjoys more than lawyers, leaving the parties in a frustrating and prolonged impasse.

I pray that you make the best choice, as there are likely factors not raised in this letter of which you alone are aware.

Thank you,
Eric Welch
10444-089

TRULINCS  10444089 - WELCH, ERIC DEXTER - Unit: MAR-B-A

---------------------------------------------------------------------------------------

FROM: Trust Fund
TO: 10444089
SUBJECT: RE:***Inmate to Staff Message***
DATE: 04/09/2019 02:47:02 PM

It works the same way with DHO or UDC sanctions. You have spent $100.00 In this validation cycle so your balance is 0 but you will revalidate soon.

***Inmate Message Below***

I noticed that I have "$0" remaining spending limit balance, even though I never spent anything after the March 30, 2019 knee-jerk over-reaction by Administration to close the institution.

Can you tell me if this will be corrected, since, in essence, even if I were guilty of an incident report to warrant loss of privileges, the math that got applied is BACK-DATED to punish for a spending that occurred in the distant past, prior to March 30.

Thanks,

E. Welch

PLAINTIFF'S EXHIBIT K

VERIFIED AFFIDAVIT/DECLARATION OF <u>John Alan Conroy</u>

State of Illinois )
) ss.    Register # <u>42054-177</u>
County of Williamson )

I, <u>John Alan Conroy</u> currently incarcerated at U.S.P. Marion, P.O.
Box 1000, 4500 Prison Road, Marion, Illinois 62959, do hereby swear and
verify that if called upon to testify in this matter, I would testify as
follows, to-wit:

1.    On March 30, 2019, Warden William True locked-down U.S.P. Marion,
alleging "Illicit Drug Use". [MEMORANDUM FOR INMATE POPULATION, April 1,
2019, issued on the third day of what would become a nine-day lockdown].
2.    During that time, a shakedown of the entire institution ensued.
3.    During that shakedown, the personal property of all inmates was
discarded, my own and others I witnessed, to include correspondence course
textbooks, inmate legal work and personal clothing within "institution
limits", or lawfully purchased commissary, along with normal refuse.
4.    I personally witnessed BOP Staff destroy government property by throwing
away functionally safe microwaves out of every single unit. These microwaves
had been purchased with inmate funds via the Trust Fund. All are now gone.
5.    During this lockdown, the Warden and his agents gave all inmates
nutritionally inadequate meals as a form of corporal punishment (no hot meals
for six days, small portions).
6.    N-Units toilets were deliberately turned off for six hours, where N-Unit
is housed by 3-man cells, forcing inmates to live in conditions with human
feces present.
7.    The Warden's agents confiscated cleaning supplies from most units, to
include toilet brushes, scouring pads, and Ajax/soap/disinfectant.

8.    Prior to the Warden's actions, I personally observed a regular "catch
and release" de facto (unwritten) policy enforced. Particular inmates
obviously guilty of intoxication by K2, Spice, or commercial chemicals
were locked up in the Special Housing Unit ("SHU"), only to be released a few
days later with apparently no consequences in some cases.

9.    I personally know of individuals who did in fact receive "shots"
(Incident Reports and disciplinary action), where Medical Staff worked in
tandem with Custody Staff to assure the accuracy, fairness and validity of a
"motor-skills assessment field-sobriety test." For reasons unknown to me,
the Warden's agents systematically failed to make these particularized
assessments in their regular duty and care of custody.

10.  The Warden engaged in Mass Punishment against all inmates, regardless of the fact that most of us (myself included) do not use drugs or other intoxicants. This was a way of manipulating inmates to turn on each other.

11.  The April 1, 2019 Memo states, in relevant part, that all inmates in the institution receive the following sanctions without a particular finding of any prohibited act:  Monthly Commissary Spending Limit reduced to $100 (from $300);  Inmate Telephone Privileges reduced to one, 5-minute telephone call per day;  and e-mails reduced to five e-mails per day, for a period of 30 days.  "If during the 30 day period there are no incidents involving inmate drug use, the limits will be increased.  Every incident involving inmate drug use will reset the 30 day time frame and may result in further reduced limits."

12.  I personally overheard the Warden or his agents explicitly say that he does not care how the issue is resolved, that any inmate who personally takes action against users/distributors will face no consequences.

13.  I personally am aware of the institution calling so-called "shot-callers" from various groups on the compound to a meeting in the gym.  At this meeting, they or others who spoke with them unanimously held that the Warden's agents encouraged them to "fix the problem by any means necessary" and all the groups declined to do so because "that is the police's job."

14.  I am suffering a loss of access to the courts and I noticed that others are as well.

15.  During this time and up to the present day, I requested an administrative remedy from Unit Manager Byram so that I could begin the administrative remedy process.

Affidavit of John Alan Conrad Page 2 of 4

16.  I fear for my safety and honestly know and believe that the situation of the security and orderly running of the institution is far more seriously threatened now, than it was before when the Warden's agents engaged in systematic "catch and release" of partular individuals.  Now, mass punishment has me (and those I talk with) on "pins and needles" with deadly risk caused by the Warden's actions.

17.  I have already been threatened (implicitly or explicitly) with retaliation by staff, to include the following:  the writing of bogus "shots"; nuisance "shake-downs"; transfer out of my cell/housing unit assignment; involuntary transfer out of work or programming assignment(s) and participation; transfer out of the institution for "diesel therapy."

18.  For all of the reasons in this affidavit/declaration, I believe petitioning the Court to be my only remaining (reasonable and lawful) option, as the safety at USP Marion is immediately at risk and staff are indifferent toward providing the administrative remedy process.

19.  In April of 2017, the Warden implemented a near-identical policy, but it was targeted at particular housing units, and not the whole institution.  If past performance is any indicator, mass punishment not only did not work, but according to the Warden's own words, the situation has become worse.  He seems to be throwing up his hands and saying "you inmates take care of it, I have no willingness to order my Staff to engage in sobriety checks, and no willingness to ship intoxicant users/distributors so that they and they alone can experience the consequences of their own actions."

20.  I desire a remedy as follows:  Immediate injunction ordering the Warden to immediately permit all inmates (except for those duly found guilty of incident reports for particular prohibited acts), full and unrestricted normal access to all Privileges;  Brand-new commercial-grade microwaves purchased for every housing unit (three per unit), to kill food-borne bacteria and meal preparation for those who **(a)** have a work schedule and physical demands for meals outside of regular "chow hall" menu/times (to complement, not supplement the institution meals); **(b)** have dietary demands due to exercise;

and (c) have medical or religious meal needs for all of the above-named purposes of meal preparation and safety.

April 13, 2019
Date Executed

/s/ John Alan Conroy

Under penalty of perjury pursuant to 28 U.S.C. § 1746, I hereby swear and verify that the foregoing is true and correct as an affidavit, and that the facts stated on information and belief are true to the best of my knowledge and belief.

Witnessed by: Eric Welch          /s/                    4/13/19
                                                              Date

Witnessed by: Matthew Sullivan    /s/                    4/13/19
                                                              Date

Affidavit of John Alan Conroy    Page 4 of 4

PLAINTIFF'S EXHIBIT L

VERIFIED AFFIDAVIT/DECLARATION OF _TONY  SKANNELL_

State of Illinois        )
                         )  ss.        Register # _2-5179-112_
County of Williamson     )

I, _TONY  SKANNELL_ currently incarcerated at U.S.P. Marion, P.O.
Box 1000, 4500 Prison Road, Marion, Illinois 62959, do hereby swear and
verify that if called upon to testify in this matter, I would testify as
follows, to-wit:

1.   On March 30, 2019, Warden William True locked-down U.S.P. Marion,
alleging "Illicit Drug Use". [MEMORANDUM FOR INMATE POPULATION, April 1,
2019, issued on the third day of what would become a nine-day lockdown].
2.   During that time, a shakedown of the entire institution ensued.
3.   During that shakedown, the personal property of all inmates was
discarded, my own and others I witnessed, to include correspondence course
textbooks, inmate legal work and personal clothing within "institution
limits", or lawfully purchased commissary, along with normal refuse.
4.   I personally witnessed BOP Staff destroy government property by throwing
away functionally safe microwaves out of every single unit. These microwaves
had been purchased with inmate funds via the Trust Fund. All are now gone.
5.   During this lockdown, the Warden and his agents gave all inmates
nutritionally inadequate meals as a form of corporal punishment (no hot meals
for six days, small portions).
6.   N-Units toilets were deliberately turned off for six hours, where N-Unit
is housed by 3-man cells, forcing inmates to live in conditions with human
feces present.
7.   The Warden's agents confiscated cleaning supplies from most units, to
include toilet brushes, scouring pads, and Ajax/soap/disinfectant.

8.   Prior to the Warden's actions, I personally observed a regular "catch
and release" de facto (unwritten) policy enforced. Particular inmates
obviously guilty of intoxication by K2, Spice, or commercial chemicals
were locked up in the Special Housing Unit ("SHU"), only to be released a few
days later with apparently no consequences in some cases.

9.   I personally know of individuals who did in fact receive "shots"
(Incident Reports and disciplinary action), where Medical Staff worked in
tandem with Custody Staff to assure the accuracy, fairness and validity of a
"motor-skills assessment field-sobriety test." For reasons unknown to me,
the Warden's agents systematically failed to make these particularized
assessments in their regular duty and care of custody.

10. The Warden engaged in Mass Punishment against all inmates, regardless of the fact that most of us (myself included) do not use drugs or other intoxicants. This was a way of manipulating inmates to turn on each other.

11. The April 1, 2019 Memo states, in relevant part, that all inmates in the institution receive the following sanctions without a particular finding of any prohibited act:  Monthly Commissary Spending Limit reduced to $100 (from $300);  Inmate Telephone Privileges reduced to one, 5-minute telephone call per day;  and e-mails reduced to five e-mails per day, for a period of 30 days.  "If during the 30 day period there are no incidents involving inmate drug use, the limits will be increased.  Every incident involving inmate drug use will reset the 30 day time frame and may result in further reduced limits."

12. I personally overheard the Warden or his agents explicitly say that he does not care how the issue is resolved, that any inmate who personally takes action against users/distributors will face no consequences.

13. I personally am aware of the institution calling so-called "shot-callers" from various groups on the compound to a meeting in the gym.  At this meeting, they or others who spoke with them unanimously held that the Warden's agents encouraged them to "fix the problem by any means necessary" and all the groups declined to do so because "that is the police's job."

14. I am suffering a loss of access to the courts and I noticed that others are as well.

15. During this time and up to the present day, I requested an administrative remedy from _mr. DAvid_____, so that I could begin the administrative remedy process.  It was denied and I followed up with e-mail to no avail.

16.  I fear for my safety and honestly know and believe that the situation of the security and orderly running of the institution is far more seriously threatened now, than it was before when the Warden's agents engaged in systematic "catch and release" of partiular individuals.  Now, mass punishment has me (and those I talk with) on "pins and needles" with deadly risk caused by the Warden's actions.

17.  I have already been threatened (implicitly or explicitly) with retaliation by staff, to include the following:  the writing of bogus "shots"; nuisance "shake-downs"; transfer out of my cell/housing unit assignment; involuntary transfer out of work or programming assignment(s) and participation; transfer out of the institution for "diesel therapy."

18.  For all of the reasons in this affidavit/declaration, I believe petitioning the Court to be my only remaining (reasonable and lawful) option, as the safety at USP Marion is immediately at risk and staff are indifferent toward providing the administrative remedy process.

19.  In April of 2017, the Warden implemented a near-identical policy, but it was targeted at particular housing units, and not the whole institution.  If past performance is any indicator, mass punishment not only did not work, but according to the Warden's own words, the situation has become worse.  He seems to be throwing up his hands and saying "you inmates take care of it, I have no willingness to order my Staff to engage in sobriety checks, and no willingness to ship intoxicant users/distributors so that they and they alone can experience the consequences of their own actions."

20.  I desire a remedy as follows:  Immediate injunction ordering the Warden to immediately permit all inmates (except for those duly found guilty of incident reports for particular prohibited acts), full and unrestricted normal access to all Privileges;  Brand-new commercial-grade microwaves purchased for every housing unit (three per unit), to kill food-borne bacteria and meal preparation for those who (a) have a work schedule and physical demands for meals outside of regular "chow hall" menu/times (to complement, not supplement the institution meals); (b) have dietary demands due to exercise;

Affidavit of _T. Skannell_, Page 3 of 4

and (c) have medical or religious meal needs for all of the above-named
purposes of meal preparation and safety.

4/13/19
Date Executed

/s/ _Doug Skannell_

     Under penalty of perjury pursuant to 28 U.S.C. § 1746, I hereby swear
and verify that the foregoing is true and correct as an affidavit, and that
the facts stated on information and belief are true to the best of my
knowledge and belief.

Witnessed by: _Matthew Sullivan_    15791-026 /s/ _____    4/13/19
                                                                 Date

Witnessed by: _Eric Welch  10444-089_ /s/ _____    4/13/19
                                                                 Date

     Affidavit of _I.Skannell_, Page 4 of 4

PLAINTIFF'S EXHIBIT M

VERIFIED AFFIDAVIT/DECLARATION OF Rhodes, Jimmy

State of Illinois        )
                         )  ss.          Register # 15025-064
County of Williamson     )

I, Rhodes, Jimmy , currently incarcerated at U.S.P. Marion, P.O. Box 1000, 4500 Prison Road, Marion, Illinois 62959, do hereby swear and verify that if called upon to testify in this matter, I would testify as follows, to-wit:

1.    On March 30, 2019, Warden William True locked-down U.S.P. Marion, alleging "Illicit Drug Use". [MEMORANDUM FOR INMATE POPULATION, April 1, 2019, issued on the third day of what would become a nine-day lockdown].
2.    During that time, a shakedown of the entire institution ensued.
3.    During that shakedown, the personal property of all inmates was discarded, my own and others I witnessed, to include correspondence course textbooks, inmate legal work and personal clothing within "institution limits", or lawfully purchased commissary, along with normal refuse.
4.    I personally witnessed BOP Staff destroy government property by throwing away functionally safe microwaves out of every single unit. These microwaves had been purchased with inmate funds via the Trust Fund. All are now gone.
5.    During this lockdown, the Warden and his agents gave all inmates nutritionally inadequate meals as a form of corporal punishment (no hot meals small portions).
6.    N-Units toilets were deliberately turned off for six hours, where N-Unit is housed by 3-man cells, forcing inmates to live in conditions with human feces present.
7.    The Warden's agents confiscated cleaning supplies from most units, to include toilet brushes, scouring pads, and Ajax/soap/disinfectant.

8.    Prior to the Warden's actions, I personally observed a regular "catch and release" de facto (unwritten) policy enforced. Particular inmates obviously guilty of intoxication by K2, Spice, or commercial chemicals were locked up in the Special Housing Unit ("SHU"), only to be released a few days later with apparently no consequences in some cases.

9.    I personally know of individuals who did in fact receive "shots" (Incident Reports and disciplinary action), where Medical Staff worked in tandem with Custody Staff to assure the accuracy, fairness and validity of a "motor-skills assessment field-sobriety test." For reasons unknown to me, the Warden's agents systematically failed to make these particularized assessments in their regular duty and care of custody.

10.  The Warden engaged in Mass Punishment against all inmates, regardless of the fact that most of us (myself included) do not use drugs or other intoxicants. This was a way of manipulating inmates to turn on each other.

11.  The April 1, 2019 Memo states, in relevant part, that all inmates in the institution receive the following sanctions without a particular finding of any prohibited act:  Monthly Commissary Spending Limit reduced to $100 (from $300);  Inmate Telephone Privileges reduced to one, 5-minute telephone call per day;  and e-mails reduced to five e-mails per day, for a period of 30 days.  "If during the 30 day period there are no incidents involving inmate drug use, the limits will be increased.  Every incident involving inmate drug use will reset the 30 day time frame and may result in further reduced limits."

12.  I personally overheard the Warden or his agents explicitly say that he does not care how the issue is resolved, that any inmate who personally takes action against users/distributors will face no consequences.

13.  I personally am aware of the institution calling so-called "shot-callers" from various groups on the compound to a meeting in the gym.  At this meeting; they or others who spoke with them unanimously held that the Warden's agents encouraged them to "fix the problem by any means necessary" and all the groups declined to do so because "that is the police's job."

14.  I am suffering a loss of access to the courts and I noticed that others are as well.

15.  During this time and up to the present day, I requested an administrative remedy from Thompson , so that I could begin the administrative remedy process.  It was denied and I followed up with e-mail to no avail. Does not ever do his job or cant be found,

16.  I fear for my safety and honestly know and believe that the situation of the security and orderly running of the institution is far more seriously threatened now, than it was before when the Warden's agents engaged in systematic "catch and release" of partiular individuals.  Now, mass punishment has me (and those I talk with) on "pins and needles" with deadly risk caused by the Warden's actions.

17.  I have already been threatened (implicitly or explicitly) with retaliation by staff, to include the following:  the writing of bogus "shots"; nuisance "shake-downs"; transfer out of my cell/housing unit assignment; involuntary transfer out of work or programming assignment(s) and participation; transfer out of the institution for "diesel therapy."

18.  For all of the reasons in this affidavit/declaration, I believe petitioning the Court to be my only remaining (reasonable and lawful) option, as the safety at USP Marion is immediately at risk and staff are indifferent toward providing the administrative remedy process.

19.  In April of 2017, the Warden implemented a near-identical policy, but it was targeted at particular housing units, and not the whole institution.  If past performance is any indicator, mass punishment not only did not work, but according to the Warden's own words, the situation has become worse.  He seems to be throwing up his hands and saying "you inmates take care of it, I have no willingness to order my Staff to engage in sobriety checks, and no willingness to ship intoxicant users/distributors so that they and they alone can experience the consequences of their own actions."

20.  I desire a remedy as follows:  Immediate injunction ordering the Warden to immediately permit all inmates (except for those duly found guilty of incident reports for particular prohibited acts), full and unrestricted normal access to all Privileges;  Brand-new commercial-grade microwaves purchased for every housing unit (three per unit), to kill food-borne bacteria and meal preparation for those who (a) have a work schedule and physical demands for meals outside of regular "chow hall" menu/times (to complement, not supplement the institution meals); (b) have dietary demands due to exercise;

and (c) have medical or religious meal needs for all of the above-named
purposes of meal preparation and safety.

#15025-064

4-11-19 /s/ Jimmy Rhodes
_____
Date Executed

    Under penalty of perjury pursuant to 28 U.S.C. § 1746, I hereby swear
and verify that the foregoing is true and correct as an affidavit, and that
the facts stated on information and belief are true to the best of my
knowledge and belief.

Witnessed by: _____ /s/ JEFF HATCH  4-11-19 27A62-045
                                          Date

Witnessed by: Barry Calvert /s/ Barry Calvert 4-11-19 15806-028
                                          Date

Affidavit of Jimmy Rhodes Page 4 of 4

PLAINTIFF'S EXHIBIT N

VERIFIED AFFIDAVIT/DECLARATION OF Bradley Gammon

State of Illinois     )
                      )  ss.          Register # 07456-025
County of Williamson  )

I, Bradley Gammon, currently incarcerated at U.S.P. Marion, P.O.
Box 1000, 4500 Prison Road, Marion, Illinois  62959, do hereby swear and
verify that if called upon to testify in this matter, I would testify as
follows, to-wit:

1.   On March 30, 2019, Warden William True locked-down U.S.P. Marion,
alleging "Illicit Drug Use". [MEMORANDUM FOR INMATE POPULATION, April 1,
2019, issued on the third day of what would become a nine-day lockdown].
2.   During that time, a shakedown of the entire institution ensued.
3.   During that shakedown, the personal property of all inmates was
discarded, my own and others I witnessed, to include correspondence course
textbooks, inmate legal work and personal clothing within "institution
limits", or lawfully purchased commissary, along with normal refuse.
4.   I personally witnessed BOP Staff destroy government property by throwing
away functionally safe microwaves out of every single unit. These microwaves
had been purchased with inmate funds via the Trust Fund. All are now gone.
5.   During this lockdown, the Warden and his agents gave all inmates
nutritionally inadequate meals as a form of corporal punishment (no hot meals
for six days, small portions).
6.   N-Units toilets were deliberately turned off for six hours, where N-Unit
is housed by 3-man cells, forcing inmates to live in conditions with human
feces present.
7.   The Warden's agents confiscated cleaning supplies from most units, to
include toilet brushes, scouring pads, and Ajax/soap/disinfectant.

8.   Prior to the Warden's actions, I personally observed a regular "catch
and release" de facto (unwritten) policy enforced. Particular inmates
obviously guilty of intoxication by K2, Spice, or commercial chemicals
were locked up in the Special Housing Unit ("SHU"), only to be released a few
days later with apparently no consequences in some cases.

9.   I personally know of individuals who did in fact receive "shots"
(Incident Reports and disciplinary action), where Medical Staff worked in
tandem with Custody Staff to assure the accuracy, fairness and validity of a
"motor-skills assessment field-sobriety test." For reasons unknown to me,
the Warden's agents systematically failed to make those particularized
assessments in their regular duty and care of custody.

10.  The Warden engaged in Mass Punishment against all inmates, regardless of the fact that most of us (myself included) do not use drugs or other intoxicants. This was a way of manipulating inmates to turn on each other.

11.  The April 1, 2019 Memo states, in relevant part, that all inmates in the institution receive the following sanctions without a particular finding of any prohibited act:  Monthly Commissary Spending Limit reduced to $100 (from $300);  Inmate Telephone Privileges reduced to one, 5-minute telephone call per day;  and e-mails reduced to five e-mails per day, for a period of 30 days.  "If during the 30 day period there are no incidents involving inmate drug use, the limits will be increased.  Every incident involving inmate drug use will reset the 30 day time frame and may result in further reduced limits."

12.  I personally overheard the Warden or his agents explicitly say that he does not care how the issue is resolved, that any inmate who personally takes action against users/distributors will face no consequences.

13.  I personally am aware of the institution calling so-called "shot-callers" from various groups on the compound to a meeting in the gym.  At this meeting, they or others who spoke with them unanimously held that the Warden's agents encouraged them to "fix the problem by any means necessary" and all the groups declined to do so because "that is the police's job."


14.  I am suffering a loss of access to the courts and I noticed that others are as well.

15.  During this time and up to the present day, I requested an administrative remedy from ___Tompson___, so that I could begin the administrative remedy process.  It was denied and I followed up with e-mail to no avail.

16.  I fear for my safety and honestly know and believe that the situation of
the security and orderly running of the institution is far more seriously
threatened now, than it was before when the Warden's agents engaged in
systematic "catch and release" of partiular individuals.  Now, mass
punishment has me (and those I talk with) on "pins and needles" with deadly
risk caused by the Warden's actions.

17.  I have already been threatened (implicitly or explicitly) with
retaliation by staff, to include the following:  the writing of bogus
"shots"; nuisance "shake-downs"; transfer out of my cell/housing unit
assignment; involuntary transfer out of work or programming assignment(s) and
participation; transfer out of the institution for "diesel therapy."

18.  For all of the reasons in this affidavit/declaration, I believe
petitioning the Court to be my only remaining (reasonable and lawful) option,
as the safety at USP Marion is immediately at risk and staff are indifferent
toward providing the administrative remedy process.

19.  In April of 2017, the Warden implemented a near-identical policy, but it
was targeted at particular housing units, and not the whole institution.  If
past performance is any indicator, mass punishment not only did not work, but
according to the Warden's own words, the situation has become worse.  He
seems to be throwing up his hands and saying "you inmates take care of it, I
have no willingness to order my Staff to engage in sobriety checks, and no
willingness to ship intoxicant users/distributors so that they and they alone
can experience the consequences of their own actions."

20.  I desire a remedy as follows:  Immediate injunction ordering the Warden
to immediately permit all inmates (except for those duly found guilty of
incident reports for particular prohibited acts), full and unrestricted normal
access to all Privileges;  Brand-new commercial-grade microwaves purchased
for every housing unit (three per unit), to kill food-borne bacteria and meal
preparation for those who **(a)** have a work schedule and physical demands for
meals outside of regular "chow hall" menu/times (to complement, not
supplement the institution meals); **(b)** have dietary demands due to exercise;

Affidavit of B.C._____, Page 3 of 4

and (c) have medical or religious meal needs for all of the above-named purposes of meal preparation and safety.

4-17-19
Date Executed

/s/ Bradley Damron

Under penalty of perjury pursuant to 28 U.S.C. § 1746, I hereby swear and verify that the foregoing is true and correct as an affidavit, and that the facts stated on information and belief are true to the best of my knowledge and belief.   15025-064

Witnessed by: Rhodes, Jimmy          /s/ Jimmy Rhodes     4-17-19
                                                                  Date

Witnessed by: Willie Wick jr          /s/ William jr     4-17-19
                                                                  Date

Affidavit of ___B.G.___ , Page 4 of 4

PLAINTIFF'S EXHIBIT O



**U.S. Department of Justice**
Federal Bureau of Prisons
*United States Penitentiary*
Marion, Illinois 62959

April 24, 2019

MEMORANDUM FOR  INMATE POPULATION

FROM:            B. True, Warden

SUBJECT:         **Reduction in Commissary Spending Limits**

In accordance with the Illicit Drug Use memorandum issued to the inmate population on April 1, 2019, the monthly commissary spending limit will continue at $75.  Specifically, in the past week, a total of four (4) inmates have been placed into the Special Housing Unit due to illicit drug use and or drug possession.

Until further notice, the following measures will be in place.

* Monthly Commissary Spending Limit will be reduced to $75.00

* Inmate Telephone Privileges will be reduced to 1, 5 minute telephone call per day

* Inmate e-mails will be reduced to 5 e-mails per day

The above restrictions will be reevaluated on a 30 days basis.  If during the 30 day period there are no incidents involving inmate drug use, the limits will be increased. Every incident involving inmate drug use will reset the 30 day time frame and may result in further reduced limits.

***We have a Zero tolerance policy for illicit drug use; therefore, inmates found in possession of Spice, K2 or any other illegal substance will be referred for prosecution.***

<u>PLAINTIFF'S EXHIBIT P</u>

VERIFIED AFFIDAVIT/DECLARATION OF *Michael Smith*

State of Illinois )
) ss.          Register # 18475-026
County of Williamson )

I, *Michael Smith*, currently incarcerated at U.S.P. Marion, P.O.
Box 1000, 4500 Prison Road, Marion, Illinois 62959, do hereby swear and
verify that if called upon to testify in this matter, I would testify as
follows, to-wit:

1.   On March 30, 2019, Warden William True locked-down U.S.P. Marion,
alleging "Illicit Drug Use". [MEMORANDUM FOR INMATE POPULATION, April 1,
2019, issued on the third day of what would become a nine-day lockdown].
2.   During that time, a shakedown of the entire institution ensued.
3.   During that shakedown, the personal property of all inmates was
discarded, my own and others I witnessed, to include correspondence course
textbooks, inmate legal work and personal clothing within "institution
limits", or lawfully purchased commissary, along with normal refuse.
4.   I personally witnessed BOP Staff destroy government property by throwing
away functionally safe microwaves out of every single unit.  These microwaves
had been purchased with inmate funds via the Trust Fund. All are now gone.
5.   During this lockdown, the Warden and his agents gave all inmates
nutritionally inadequate meals as a form of corporal punishment (no hot meals
for six days, small portions).
6.   N-Units toilets were deliberately turned off for six hours, where N-Unit
is housed by 3-man cells, forcing inmates to live in conditions with human
feces present.
7.   The Warden's agents confiscated cleaning supplies from most units, to
include toilet brushes, scouring pads, and Ajax/soap/disinfectant.

8.   Prior to the Warden's actions, I personally observed a regular "catch
and release" de facto (unwritten) policy enforced.  Particular inmates
obviously guilty of intoxication by K2, Spice, or commercial chemicals
were locked up in the Special Housing Unit ("SHU"), only to be released a few
days later with apparently no consequences in some cases.

9.   I personally know of individuals who did in fact receive "shots"
(Incident Reports and disciplinary action), where Medical Staff worked in
tandem with Custody Staff to assure the accuracy, fairness and validity of a
"motor-skills assessment field-sobriety test."  For reasons unknown to me,
the Warden's agents systematically failed to make these particularized
assessments in their regular duty and care of custody.

10. The Warden engaged in Mass Punishment against all inmates, regardless of the fact that most of us (myself included) do not use drugs or other intoxicants. This was a way of manipulating inmates to turn on each other.

11. The April 1, 2019 Memo states, in relevant part, that all inmates in the institution receive the following sanctions without a particular finding of any prohibited act:  Monthly Commissary Spending Limit reduced to $100 (from $300);  Inmate Telephone Privileges reduced to one, 5-minute telephone call per day;  and e-mails reduced to five e-mails per day, for a period of 30 days.  "If during the 30 day period there are no incidents involving inmate drug use, the limits will be increased.  Every incident involving inmate drug use will reset the 30 day time frame and may result in further reduced limits."

12. I personally overheard the Warden or his agents explicitly say that he does not care how the issue is resolved, that any inmate who personally takes action against users/distributors will face no consequences.

13. I personally am aware of the institution calling so-called "shot-callers" from various groups on the compound to a meeting in the gym.  At this meeting, they or others who spoke with them unanimously held that the Warden's agents encouraged them to "fix the problem by any means necessary" and all the groups declined to do so because "that is the police's job."

14. I am suffering a loss of access to the courts and I noticed that others are as well.

15. During this time and up to the present day, I requested an administrative remedy from *Mr. Thompson*, so that I could begin the administrative remedy process.  It was denied and I followed up with e-mail to no avail.

Affidavit of *Michael Smith* Page 2 of 4

16.  I fear for my safety and honestly know and believe that the situation of the security and orderly running of the institution is far more seriously threatened now, than it was before when the Warden's agents engaged in systematic "catch and release" of particular individuals.  Now, mass punishment has me (and those I talk with) on "pins and needles" with deadly risk caused by the Warden's actions.

17.  I have already been threatened (implicitly or explicitly) with retaliation by staff, to include the following:  the writing of bogus "shots"; nuisance "shake-downs"; transfer out of my cell/housing unit assignment; involuntary transfer out of work or programming assignment(s) and participation; transfer out of the institution for "diesel therapy."

18.  For all of the reasons in this affidavit/declaration, I believe petitioning the Court to be my only remaining (reasonable and lawful) option, as the safety at USP Marion is immediately at risk and staff are indifferent toward providing the administrative remedy process.

19.  In April of 2017, the Warden implemented a near-identical policy, but it was targeted at particular housing units, and not the whole institution.  If past performance is any indicator, mass punishment not only did not work, but according to the Warden's own words, the situation has become worse.  He seems to be throwing up his hands and saying "you inmates take care of it, I have no willingness to order my Staff to engage in sobriety checks, and no willingness to ship intoxicant users/distributors so that they and they alone can experience the consequences of their own actions."

20.  I desire a remedy as follows:  Immediate injunction ordering the Warden to immediately permit all inmates (except for those duly found guilty of incident reports for particular prohibited acts), full and unrestricted normal access to all Privileges;  Brand-new commercial-grade microwaves purchased for every housing unit (three per unit), to kill food-borne bacteria and meal preparation for those who (a) have a work schedule and physical demands for meals outside of regular "chow hall" menu/times (to complement, not supplement the institution meals); (b) have dietary demands due to exercise;

Affidavit of *Michael Smith*, Page 3 of 4

and (c) have medical or religious meal needs for all of the above-named purposes of meal preparation and safety.



4/24/19                                    /s/ Michael Smith
Date Executed

    Under penalty of perjury pursuant to 28 U.S.C. § 1746, I hereby swear
and verify that the foregoing is true and correct as an affidavit, and that
the facts stated on information and belief are true to the best of my
knowledge and belief.

Witnessed by: Jamier Plunkett  10.030-025  /s/ Plunkett          4-24-19
                                                                 Date

Witnessed by: _____ 64284-097  /s/ Thomas F. Attebury  4/24/2019
                                                                 Date


            Affidavit of  Michael Smith , Page 4 of 4

TRULINCS  18475026 - SMITH, MICHAEL - Unit: MAR-G-A

--------------------------------------------------------------------------------------------------

FROM: 18475026
TO: Unit Management East
SUBJECT: ***Request to Staff*** SMITH, MICHAEL, Reg# 18475026, MAR-G-A
DATE: 04/16/2019 01:41:38 PM

To: Mr.Thompson
Inmate Work Assignment: unicor

I would like to request a bp-8...at your earliest time ,to process my adminstrative remedys.. thank u